# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA, ORLANDO DIVISION

|  |  |
|---|---|
| TRAVIS GRANT, an individual,<br><br>       Plaintiff,<br><br>vs.<br><br>ASHLEY BROOKE MOODY, in her official capacity as Attorney General of the State of Florida,<br><br>       Defendant. | Case No._____<br><br>Demand for a Jury Trial<br>Declaratory Relief Requested<br>Injunctive Relief Requested<br>Challenge to the Constitutionality of F.S. § 901.43 |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

For his Complaint, Plaintiff Travis Grant ("Travis") alleges as follows:

1.     This action seeks to invalidate a new Florida law, Senate Bill No. 1046 ("SB 1046"), a copy of which is attached hereto as **Exhibit A**, and the specific Florida statute it modifies, F.S. § 901.43 (effective October 1, 2021).

2.     In short, SB 1046 and F.S. § 901.43 attempt to ban the publication of "arrest booking photographs," also known as "mugshots," but the ban does not apply equally to everyone. Instead, SB 1046 and F.S. § 901.43 only restrict the speech of *certain categories of speakers*, singling them out as a disfavored class and treating them differently than all others, even when the speech in question is otherwise identical.

3.     By denying Plaintiff his right to engage in constitutionally-protected speech involving matters of public interest and concern, and by

- 1 -

targeting Plaintiff for different, and less favorable, treatment than other Florida-resident speakers without any legitimate basis for doing so, SB 1046 and F.S. § 901.43 are unconstitutional, both on their face and as applied.

## PARTIES

4.    Plaintiff Travis Grant is a married man residing in Orange County, Florida. Mr. Grant has resided in Florida during all times relevant to this case.

5.    Since at least 2018 through the present, Mr. Grant has owned and operated numerous public websites including, but not limited to, RapSheets.org, RapSheetz.com, BailBondSearch.com and PublicPoliceRecord.com, among others ("Travis's Websites").

6.    Defendant Ashley Brooke Moody is the Attorney General of the State of Florida. She is the State's chief law enforcement officer and representative of the State in "all suits or prosecutions, civil or criminal or in Empowerment," brought or opposed by the State. F.S. §§ 16.01, *et. seq.* Ms. Moody is sued solely in her official capacity as legal representative of Florida.

## JURISDICTION AND VENUE

7.    This Court has federal question jurisdiction over this federal civil rights action under 28 U.S.C. § 1331 because the claims in this action arise under, and seek enforcement of, the U.S. Constitution and federal law.

8.     This action involves federal questions because Plaintiff's claims arise under federal law, 42 U.S.C. § 1983 and the First and Fourteenth Amendments, and this action seeks to invalidate certain provisions of Florida law based on federal preemption under the Constitution's Supremacy Clause and under federal statute, specifically 47 U.S.C. § 230(e)(3).

9.     This Court has authority to grant relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, and the Civil Rights Act, 28 U.S.C. § 1343(a), 42 U.S.C. § 1983. In addition, this Court has authority to issue injunctive relief under the All Writs Act, 28 U.S.C. § 1651.

10.     This Court's jurisdiction is properly exercised over Defendant in her official capacity, *Ex parte Young*, 209 U.S. 123 (1908), as Plaintiff is seeking declaratory and injunctive relief against the State of Florida and its agents.

11.     There is an actual controversy relating to the legal rights and duties of Plaintiff to warrant relief under 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201, 2202. The harm to Plaintiff described herein is sufficiently real and imminent to warrant the issuance of a conclusive declaratory judgment and prospective injunctive relief.

12.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2). The Attorney General of Florida, in her official capacity, regularly conducts business and proceedings in her offices in this District, and the events giving rise to Plaintiff's claims occurred in this District.

## SUMMARY OF HOW TRAVIS'S WEBSITES WORK

13.    As a matter of course and for more than 100 years, many state and local law enforcement agencies take photographs of every person arrested for a crime. These photos are frequently referred to as "arrest booking photographs", also known as "mugshots."

14.    Historically, mugshots have been used for both law enforcement purposes and for other purposes including reporting newsworthy information regarding arrests which are notable either due to the status of the person arrested or the particular nature of their alleged crimes, among other reasons.

15.    For example, one of the richest men in the world—Microsoft co-founder Bill Gates—was arrested more than 40 years ago in 1977 in New Mexico. Even though Gates was not famous or wealthy at the time, and even though the underlying offense was extremely minor (driving without a license), Mr. Gates's mugshot remains notable nearly half a century later, perhaps because of the immense success Gates achieved many years *after* his arrest.



16.     Although specific policies vary from state to state, most states, including Florida, generally regard mugshots as public records.

17.     As matters of public record, mugshots in Florida have generally been freely accessible to members of the news media and to members of the public as a matter of course.

18.     For more than 100 years, the public policy of the State of Florida has favored the concept of "open government" which means, among other things, that most governmental activities and records are open to public review and public scrutiny.

19.     Florida's "open government" policy led to "Government-in-the-Sunshine" laws such as F.S. § 119.07(1)(a) which mandates that "Every person who has custody of a public record shall permit the record to be inspected and copied by any person desiring to do so, at any reasonable time, under reasonable conditions … ."

20.     In keeping with the practice and policy of Florida's Sunshine Law, many state and local police departments and other government agencies in Florida have adopted policies of routinely publishing information about arrests on their websites.

21.     Information published by such agencies typically includes the name of each person arrested, information about the crime(s) each person has been charged with, and the mugshot of the individual, if one was taken.

22.    For many years, law enforcement agencies across Florida have published, and continue to publish, mugshots on the Internet. Such publications often occur before the individual has been convicted of any crime.

23.    For various reasons, some law enforcement agencies only publish mugshots on the Internet for a limited period of time, after which point those records are no longer available online, even if they remain matters of public record and are otherwise available upon request.

24.    Under Florida law, regardless of whether they are currently published on the Internet or not, mugshots and other arrest-related records are matters of public record which are subject to inspection by any member of the public.

25.    As a matter of law, information regarding crimes, arrests, and criminal proceedings in the State of Florida are matters of public interest and concern; "Crimes and arrests are newsworthy matters, falling within the scope of legitimate public concern." *Anderson v. Best Buy Stores LP*, No. 5:20-cv-41-Oc-30PRL, 2020 WL 5122781, *2 (M.D.Fla. July 28, 2020) (emphasis added) (citing *Cape Publications, Inc. v. Bridges*, 423 So.2d 426, 427 & n.2 (Fla. 5th DCA 1982) ("[w]ithin the scope of legitimate public concern are matters customarily regarded as 'news,'" which includes publications concerning crimes, arrests, police raids, suicides, marriages, divorces etc.) (emphasis added).

26.     Crimes, arrests, and criminal proceedings in the State of Florida are matters of public interest and concern; even when charges are dropped or are never filed, even when the individual in question is not prosecuted, and even when the individual in question is prosecuted but later acquitted.

27.     For example, in 2008 a Florida resident named Casey Anthony was arrested and accused of murdering her 2-year-old daughter Caylee. A jury later found Ms. Anthony not guilty of the murder.

28.     Despite her exoneration a decade ago, Ms. Anthony's mugshot remains widely available on thousands of websites today.

**Acquitted Baby Killer, Casey Anthony**



29.     Whether the arrestee is a future billionaire or an unknown young mother, information about who is arrested, what they are accused of, and how

the case was resolved, is important and involves matters of public interest and concern, even when the allegations are later dismissed or disproved.

30. To help bring more sunshine to these issues and to help make public records easier to find, in the mid-2010s Travis Grant created several different websites that gather, index, and archive mugshots and related information.

31. At present, Travis's Websites contain more than 20 million arrest records gathered from 45 different U.S. states. The only states not represented in the index are Alaska, Delaware, Hawaii, Massachusetts and Vermont.

32. Travis's Websites generally and typically do not contain information about *federal* criminal arrests or cases because that information is not regularly published on the Internet by federal law enforcement agencies.

33. As a general rule, excluding certain generic content (e.g., the site's navigation menus, Terms of Service & Privacy Policy) and excluding certain articles and editorial content clearly identified as such, all mugshots and arrest-related information contained on Travis's Websites were originally published on the Internet by the arresting agencies, not by Travis.

34. After a mugshot and other arrest-related information is published on the Internet by the arresting agency, Travis's Websites use software to automatically copy, index, and archive that information which is then complied into a computer database. This database of arrest records is used to display

content on all of Travis's Websites, and to respond to specific search queries entered by users of Travis's Websites.

35.     Travis's Websites are continuously and automatically updated as new information is published online by law enforcement. As a result, Travis's Websites add thousands of new records every day.

36.     Regardless of the source, arrest information compiled and displayed on Travis's Websites generally appears in a standard "template" format. The same, or similar, template is used by all of Travis's Websites.

37.     As one example, below is a web page that currently appears on the Florida Department of Corrections website which displays information about a woman arrested and convicted of murder. The complete original page is attached hereto as **<u>Exhibit B</u>** and is incorporated herein by reference.

**Fig. 1; Original Florida DOC Page; Exhibit B**



38.    After the above page was published on the Internet by the Florida Department of Corrections, the offender's photograph, name, and other related information about the case was automatically copied and indexed by Travis's Websites.

39.    Attached hereto as **Exhibit C** and incorporated by reference, is a copy of the related page which appears on Travis's Website regarding the same person. A portion of this page (which is too long to insert fully here) is shown below. The original page remains available on one of Travis's Websites here:

https://www.publicpolicerecord.com/florida/doc-prisoner/LIMA_MAYLIN/
162854.

**Fig. 2; Travis's Website Sample Page Excerpt; Exhibit C**



40.    The name, photograph and all other case-related information appearing in **Exhibit C** was copied *verbatim* from the Florida DOC website. However, the page on Travis's Website contains at least one obvious difference from the original source page – the page on Travis's Website contains advertisements from Google's "AdSense" program, whereas the Florida DOC page does not contain any advertising. The sample page appearing above contains three different Google AdSense ads, circled in red for clarity.

41.    Google AdSense ads always contain a small blue triangle and/or a blue letter "X" (example:  ▷ ✕) in the upper-right corner of the ad, which is

an industry-standard notification to show the advertising content is from Google's AdSense program. These blue triangles are visible in the example above, and in every Google ad appearing on Travis's Websites.

42.     The content of Google AdSense ads is created solely by third party customers of the AdSense program, not by Travis or anyone else associated with Travis's Websites.

43.     As a participant in the AdSense program, Travis's Websites contain small amounts of code which Google uses to "push" advertisements to the site each time a person visits a page. One example of that code is shown below:

### Fig. 3; Google AdSense Code

```
377        <script async src="//pagead2.googlesyndication.com/pagead/js/adsbygoogle.js"></script>
378  <script>
379      (adsbygoogle = window.adsbygoogle || []).push({
380          google_ad_client: "ca-pub-7374981675475638",
381          enable_page_level_ads: true
382      });
383  </script>
```

44.     When a person visits any of Travis's Websites and sees an AdSense ad, that advertisement is transmitted to the viewer's computer directly by and directly from Google. The content of the ad (*i.e.*, the text and any image it may contain) is never stored on, nor is such content served by, Travis's computers. All AdSense content is served directly from Google, not Travis.

45.     Other than granting Google the ability to display ads on Travis's Websites, Travis has no control over which Google AdSense ads (if any) appear

for a specific viewer or what those ads say. The choice to display a specific ad is made entirely and exclusively by Google, not by Travis.

46.     In effect, the AdSense program operates similarly to an electronic billboard on the side of a highway. In this hypothetical example, Travis owns the land on which the billboard is located, and he owns the display screen, wiring and physical support structure which comprise the billboard. However, Travis does not create or control the content appearing on the billboard's screen.

47.     Instead, Travis rents the electronic billboard to Google and allows Google to use it to display advertising content for Google's customers. Google's customers create the ads, and they pay Google a fee to "serve" those ads to viewers.

48.     Google controls the prices charged to its customers, and Google controls which ads are shown to any particular person at any particular time.

49.     In return, Google pays Travis a fee based on the number of ads displayed.

50.     In this example, although Travis owns the billboard, he does not cause it to display any specific content nor does he have any control over the content displayed. Those choices are made solely and exclusively by Google.

51.     Most Google Ads promote a product or service of some kind, but none of these products or services are offered or sold by Travis. Any products

or services shown in Google Ads appearing on Travis's Websites are solely those offered and sold by unrelated third-party vendors.

52.    Although Google Ads usually promote a commercial product or service of some kind, Google also allows the program to be used for non-commercial purposes including, but not limited to, political and election-related                                    advertising.                *See* https://support.google.com/adspolicy/answer/6014595?hl=en.

53.    Travis's Websites are entirely free to use. The sites do not charge any fees to view records, or to conduct searches. Any person may freely access Travis's Websites at any time, for any reason, and at no cost.

54.    Travis does not sell, nor has he ever sold, any products or services of any kind on Travis's Websites.

55.    Travis does not solicit or accept any money or anything else of value to remove records from any of Travis's Websites.

### SUMMARY OF PRIOR VERSION OF F.S. § 901.43

56.    Several years ago, a variety of new websites appeared which were focused on publishing mugshots and related criminal records. One of the largest and most prominent of these was www.MugShots.com.

57.    The owners of Mugshots.com allegedly solicited and accepted money to remove mugshots. This practice was widely regarded as cruel, exploitative, and unconscionable.

58.     In 2018, the owners/operators of MugShots.com were indicted in the State of California and charged with various crimes including extortion, money laundering, and identity theft relating to the operation of their website. *See* [https://oag.ca.gov/news/press-releases/attorney-general-becerra-announces-criminal-charges-against-four-individuals.](https://oag.ca.gov/news/press-releases/attorney-general-becerra-announces-criminal-charges-against-four-individuals.)

59.     In short, the owners of MugShots.com were accused of publishing mugshots and then charging fees of several hundred dollars to remove them.

60.     In response to the alleged conduct of the owners of MugShots.com (and other similar sites), in the mid 2010s, many states began adopting laws restricting the use of mugshots online, particularly where the website owner charged money to remove or to "depublish" a mugshot or arrest record.

61.     Initially, Florida responded by passing F.S. § 901.43 which became effective in July 2018. In short, this law provided that website owners "may not solicit or accept a fee or other form of payment to remove the photographs," and it required some (but not all) website operators to remove mugshots upon request.

62.     If a written removal request was ignored, and if the website was subject to the requirements of F.S. § 901.43, the affected party could bring a civil action for injunctive relief requiring the removal of his/her mugshot.

63.     If the removal injunction was ignored, F.S. § 901.43(3) authorized civil penalties of $1,000 per day, payable to Florida's General Revenue Fund.

64.     F.S. § 901.43(4) also expanded the scope of Florida's Unfair and Deceptive Trade Practices Act ("FDUTPA"), F.S. § 501, to include refusal to remove a mugshot after a written request was made in FDUTPA's definition of unfair and deceptive trade practices.

65.     This interaction with FDUTPA is significant because FDUTPA has a government enforcement mechanism. F.S. § 501.207 allows a Florida "enforcing authority" to bring an action for declaratory, injunctive, and monetary relief for violations of FDUTPA. F.S. § 501.203(2) defines the "enforcing authority" as either the state attorney or the Department of Legal Affairs, i.e., the Florida Attorney General's office.

66.     Importantly, the original version of F.S. § 901.43 contained a substantial exclusion—the law did not apply to all websites that published mugshots. Instead, the original version of F.S. § 901.43 only applied to websites IF the site solicited or accepted fees to remove mugshots.

67.     In other words, if a website displayed mugshots but did *not* solicit or accept fees to remove them, then by its own terms F.S. § 901.43 did not apply to that website at all. *See* F.S. § 901.43(5). In that case, the site was not required to remove mugshots upon request, nor would the site be subject to injunctive relief or fines under F.S. § 901.43(3).

68.     Since F.S. § 901.43 became effective in July 2018, Travis has not solicited or accepted money or anything else of value to remove mugshots.

69.     Instead, Travis's sole and exclusive source of income is from the display of Google Ads on Travis's Websites.

70.     Although not required by any law, Travis's Websites have adopted a written policy, available here: https://www.publicpolicerecord.com/opt-out/ allowing anyone to request removal of mugshots at no cost in certain situations (i.e., where the records have been ordered sealed, expunged, etc.).

71.     Pursuant to this policy, since July 2018, Travis's Websites have removed and/or updated thousands of arrest records at no cost.

72.     Travis's Websites have also received removal requests that do not satisfy their written policy, and these non-compliant requests are not honored.

73.     The removal policy of Travis's Websites is not co-extensive with the circumstances in F.S. § 901.43 which require removal of a mugshot.

74.     In addition, since July 2018, all of Travis's Websites have contained similar (and repeated) statements advising that each site does not solicit or accept payment to remove records. One such example is shown below:

**PUBLICPOLICERECORD.COM          WEBSITE DOES NOT SOLICIT OR ACCEPT A FEE OR ANY FORM OF PAYMENT TO TAKE DOWN ARREST RECORDS INFORMATION**

75.     Because Travis's Websites do not solicit or accept payment to remove records, Travis was not subject to the notice and removal requirements of F.S. § 901.43 prior to SB 1046 going into effect.

## SUMMARY OF SB 1046

76.     In June 2021, the Florida legislature passed SB 1046, apparently without performing any analysis to determine whether the proposed law would be constitutional.

77.     Attached hereto as **Exhibit D**, and incorporated by reference, is the Bill Analysis and Fiscal Impact Statement prepared by the Florida Senate regarding SB 1046.

78.     In the Bill Analysis, the Senate correctly recognized: "Like all other records prepared by Florida government agencies, arrest and crime reports are generally considered to be subject to public disclosure unless specifically exempted."

79.     The Bill Analysis further correctly noted: "Florida law does not specifically prohibit mugshot companies from posting booking photographs, but does prohibit charging a removal fee."

80.     After making various superficial remarks about the existing state of Florida law, the Bill Analysis describes the effect of SB 1046 as follows:

> The bill amends s. 901.43, F.S., expanding this section to subject any person or entity that publishes or disseminates information relating to arrest booking photographs when the person or entity's primary business model is the publishing and disseminating of arrest booking photographs for a commercial purpose or pecuniary gain, to a civil penalty for failing to remove the arrest booking photograph upon written request.

81.   In short, SB 1046 makes substantial changes to F.S. § 901.43 which became effective on October 1, 2021.

82.   First and most importantly, SB 1046 modified the broad exclusion of F.S. § 901.43(5) which previously limited the law's application only to websites that solicit or charge fees to remove mugshots.

83.   Now, under the new version of F.S. § 901.43, the law will apply to websites that solicit or accept payment to remove mugshots **and also** to all websites whose "*primary business model is the publishing and dissemination of arrest booking photographs for a commercial purpose or pecuniary gain.*"

84.   This definition includes Travis's Websites because they display mugshots and earn money from doing so.

85.   In addition to expanding the scope of F.S. § 901.43 to apply to websites that earn money from publishing mugshots, SB 1046 further modified F.S. § 901.43 by increasing the civil penalties for violations up to $5,000 per day, payable to the State of Florida's General Revenue Fund.

86.   The net effect of SB 1046 is very simple—it expressly prohibits the publication of mugshots in the State of Florida, **but only when the website owner earns money from doing so**.

87.   If a website owner (or user) publishes mugshots *without* earning any money, then F.S. § 901.43 simply does not apply at all. This means even

after SB 1046's effective date, any person can freely publish mugshots in Florida, as long as they earn nothing from doing so.

88.     The purpose and effect of SB 1046 is *not* to prevent all publication of mugshots; its sole purpose is to shut down any website that *primarily* earns money from publishing mugshots.

89.     Put differently, the amended version of F.S. § 901.43 does not apply if the website owner earns money from publishing mugshots but also happens to earn money from other sources, such that income earned from mugshot publication is not the website owner's "*primary business model.*" However, SB 1046 does not define the term "primary business model," nor does it explain how a court or fact finder should determine what, exactly, the *primary* business model of a website is, or what facts are relevant to that determination.

90.     By operation of F.S. § 901.43(4), the Florida Attorney General and Florida State Attorneys may bring actions for declaratory, injunctive, and monetary relief against website owners who primarily earn money from publishing mugshots.

91.     As a matter of law, the United States Supreme Court has already determined the publication of information contained in public records, including information obtained from criminal records, is subject to strong First Amendment protection. *Florida Star v. B.J.F.*, 491 U.S. 524 (1989) (holding

Florida law which prohibited the publication of the name of sexual assault victims was unconstitutional); *see also Cox Broad. Corp. v. Cohn*, 420 U.S. 469 (1975) (finding Georgia law unconstitutional which made it a crime to broadcast the name of a rape victim).

92.     Because mugshots and related arrest records are matters of public record under Florida law, their publication (either for commercial purposes or otherwise) is protected by the First Amendment to the United States Constitution.

93.     Because it expressly seeks to prohibit the publication of constitutionally protected speech, F.S. § 901.43, as amended by SB 1046, is unconstitutional, both on its face and as applied to Travis's Websites.

94.     There is no lawful basis to prohibit otherwise lawful, protected speech solely on the basis that the speaker earns money from the speech. This type of speaker-based prohibition is facially and presumptively unconstitutional.

95.     In addition, SB 1046 and the updated version of F.S. § 901.43 also conflict with, and are therefore preempted by, federal law, specifically the Communications Decency Act, 47 U.S.C. § 230 (the "CDA").

96.     SB 1046 and the updated version of F.S. § 901.43 each seek to prohibit the _republication_ of existing online content; *i.e.*, mugshots, arrest records, and other similar information <u>which has previously been published on</u>

the Internet by law enforcement. In this way, these laws directly conflict with, and are preempted by, 47 U.S.C. § 230(c)(1) which expressly *permits, authorizes, and encourages* the republication of existing online content.

97.    When Congress passed the CDA in 1996, it declared the public policy of the United States is "to promote the continued development of the Internet and other interactive computer services and other interactive media;" and "to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation … ." 47 U.S.C. § 230(b)(1)–(2) (emphasis added).

98.    To effect and to implement that policy of unfettered regulation, 47 U.S.C. § 230(c)(1) provides:

> No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

99.    The CDA expressly preempts any contrary state or local law that is inconsistent with its provisions. *See* 47 U.S.C. § 230(e)(3) (providing, in part, "No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.")

100.    When it applies, the CDA also provides immunity from suit and immunity from injunctive relief. *See Giordano v. Romeo*, 76 So.3d 1100 (Fla. 3d Dist 2011) (injunctive relief against website operator barred by CDA); *see also Doe v. KIK Interactive, Inc.*, 482 F. Supp. 3d 1242 (S.D. Fla. 2020).

101.   Travis is a provider of an "interactive computer service" within the meaning of the CDA because he operates websites which allow users to view and access information.

102.   The terms of F.S. § 901.43(1) (extending the law to "Any person or entity engaged in the business of <u>publishing</u> through a publicly accessible print or electronic medium or otherwise disseminating arrest booking photographs …") seek to treat Travis as a "<u>publisher or speaker</u>" of information (*viz.*: mugshots and arrest records) which have been provided by another information content provided (i.e., the original arresting agency which first published that information online).

103.   By treating Travis as a publisher of information provided by another content provider, F.S. § 901.43 is inconsistent with 47 U.S.C. § 230(c)(1) and is therefore preempted by 47 U.S.C. § 230(e)(3).

### FIRST CAUSE OF ACTION
### (42 U.S.C. § 1983)
### <u>Violation of Free Speech and Free Press Rights Under the First and Fourteenth Amendments to the Constitution of the United States</u>

104.   Plaintiff repeats and realleges the preceding paragraphs of this Complaint.

105.   The First Amendment provides certain rights to Travis, including the right to speak on matters of public interest and concern, subject to certain limitations.

106.   Crime, arrests, criminal prosecutions, and criminal proceedings are, as a matter of law, matters of public interest and concern.

107.   Any state law which seeks to regulate or restrict speech based either on its content, or on the identity of the speaker, implicates the First Amendment.

108.   F.S. § 901.43 is a content-based restriction on speech.

109.   By limiting its restrictions only to certain categories of speakers but not to others, even when the underlying speech is otherwise identical, F.S. § 901.43 attempts to regulate speech based on the identity of the speaker.

110.   Content-based and speaker-based restrictions on speech are presumptively unconstitutional.   *See Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

111.   F.S. § 901.43 violate the First Amendment by improperly and unlawfully creating content-based and speaker-based restrictions on speech involving matters of public interest and public concern.

<div align="center">

**SECOND CAUSE OF ACTION**
**(42 U.S.C. § 1983)**
**Equal Protection Violation**
<u>**Fourteenth Amendment to the Constitution of the United States**</u>

</div>

112.   Plaintiff repeats and realleges the preceding paragraphs of this Complaint.

113.   The Fourteenth Amendment to the United States Constitution provides:

> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

114.   The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985).

115.   In addition, "[t]he Equal Protection Clause requires that statutes affecting First Amendment interests be narrowly tailored to their legitimate objectives." *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 101 (1972).

116.   On its face, F.S. § 901.43 violates the Fourteenth Amendment because it denies Plaintiff equal protection of the law by attempting to treat Plaintiff differently than other similarly-situated persons based solely on the fact that Plaintiff receives "pecuniary gain" from publishing mugshots.

117.   The fact that Plaintiff earns money from Travis's Websites is not a lawful or legitimate justification for treating Plaintiff less favorably than any others who publish the same speech without pecuniary gain.

118.   F.S. § 901.43 also violates the Fourteenth Amendment because it is not narrowly tailored to achieve a legitimate governmental objective. To the extent that publishing a mugshot or other arrest record may cause some form

of reputational or emotional harm to the person whose records are published, reducing that harm is a personal interest of the individual whose records are published, not a legitimate governmental interest.

119.   To the extent that publishing information about individuals who have been arrested results in reputational, emotional, or other harm to the individuals whose records are published, the State of Florida has already determined that the public interest in open, transparent government outweighs any resulting harm to the individuals whose records are published online by state and local law enforcement agencies in Florida.

120.   To the extent that publishing information about individuals who have been arrested results in reputational, emotional, or other harm to the individuals whose records are published, the harm caused by such publication bears no relation whatsoever to the economic motives of the speaker. In other words, if a person is arrested and their mugshot is published on the Internet, it makes no difference *who* published that information or why they did so. The exact same reputational and emotional harm will be experienced by the individual depicted regardless of how much, or how little, pecuniary gain is received by the publisher.

121.   The United States Supreme Court has previously determined that states may not properly discriminate against public speech or speakers solely on the basis that the speaker earns money or has some other form of

commercial motivation. *See City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 424–25, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993) (city ordinance was unconstitutional because it completely banned only *commercial* newsracks on public property while allowing *non-commercial* newsracks to remain; "Not only does Cincinnati's categorical ban on commercial newsracks place too much importance on the distinction between commercial and noncommercial speech, but, in this case, the distinction bears no relationship whatsoever to the particular interests that the city has asserted.")

122.   For each of these reasons, F.S. § 901.43 violates Plaintiff's right to equal protection because it seeks to treat Plaintiff less favorably than other similarly-situated persons without any legitimate basis for doing so, and it is not narrowly tailored to address any legitimate governmental interests.

### THIRD CAUSE OF ACTION
### (42 U.S.C. § 1983)
### Violation of Due Process Rights Under the Fifth and
### <u>Fourteenth Amendments to the Constitution of the United States</u>

123.   Plaintiff repeats and realleges the preceding paragraphs of this Complaint.

124.   In addition to its other constitutional infirmities, F.S. § 901.43 violates Plaintiff's right to due process because the law is also unconstitutionally vague and overbroad.

125.   Specifically, F.S. § 901.43 attempts to establish a line between websites whose "*primary business model* is the publishing and disseminating of arrest booking photographs *for a commercial purpose* or *pecuniary gain*[]", and all other websites. But F.S. § 901.43 does not explain or define the term "primary business model" – does this term mean a website must earn <u>50.1% of its revenue</u> from publishing mugshots before the law applies? Or is the relevant question how much *traffic a* website generates from mugshot pages as compared with other pages?

126.   Determining whether a website's "primary business model" is focused on generating income from publishing mugshots as opposed to publishing something else is virtually impossible, given that many websites contain a mix of both mugshots and other crime-related news and similar content.

127.  For example, TheSmokingGun.com is a popular website that publishes crime-related news and information. Some pages published by the site contain mugshots, while other pages do not, and just like Travis's Websites, TheSmokingGun.com contains Google AdSense ads along the top of the page. Does that mean the site falls within the scope of F.S. § 901.43?



128.  Similarly, mainstream news websites such as CNN.com, FoxNews.com and others regularly publish mugshots and do so for commercial purposes. Does that mean CNN and Fox News are subject to F.S. § 901.43?

129.   Regardless of employing relatively simplistic-sounding terms like "primary business model," "commercial purpose," and "pecuniary gain," F.S. § 901.43 is unconstitutional because it is vague, overbroad, and fails to provide fair warning of what conduct is being regulated. *See FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012). A law is unconstitutionally vague when people "of common intelligence must necessarily guess at its meaning," *Connally v. Gen. Constr. Co.,* 269 U.S. 385, 391 (1926), or where the law lacks definite and explicit standards, thereby encouraging "arbitrary and discriminatory" application, *Kolender v. Lawson*, 461 U.S. 352 (1983).

## FOURTH CAUSE OF ACTION
### (Declaratory Judgment Act)
### (42 U.S.C. § 1983)
### Preemption under the Supremacy Clause of the Constitution
### of the United States and 47 U.S.C. § 230(e)(3)

130.   Plaintiff repeats and realleges the preceding paragraphs of this Complaint.

131.   Under 47 U.S.C. § 230, it is federal policy "to promote the continued development of the Internet and other interactive computer services and other interactive media" and "preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation." 47 U.S.C. § 230(b)(1), (2). Among the important purposes advanced by Section 230, Congress sought "to encourage service providers to self-regulate the dissemination of offensive

material over their services." *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1163 (9th Cir. 2008) (en banc). This is its principal purpose.

132.   F.S. § 901.43 directly conflicts with the provisions of 47 U.S.C. § 230(c)(1) because it permits the imposition of substantial civil penalties of $5,000 per day, payable to Florida's General Revenue Fund, solely because Plaintiff "republishes" existing online content (i.e., mugshots and arrest records that were previously published on the Internet by another source). In doing so, F.S. § 901.43 permits a plaintiff to treat Travis as a "publisher or speaker" of information provided by another information content provider.

133.   To this extent, Plaintiff is entitled to an order declaring that F.S. § 901.43 conflicts with, and is therefore preempted by, 47 U.S.C. § 230(e)(1).

## JURY DEMAND

Plaintiff demands a jury trial on any issues so triable.

## PRAYER FOR RELIEF

Plaintiff requests that the Court grant him the following relief:

A.   An order finding that F.S. § 901.43 is unconstitutional, both on its face and as applied to the operation of Travis's Websites;

B.   An order declaring that F.S. § 901.43 is preempted by 47 U.S.C. § 230(e)(1) as it relates to the operation of Travis's Websites;

C.    An order preliminarily and permanently enjoining Defendant, her agents, and all others with notice of the Court's order, from enforcing F.S. § 901.43;

D.    An order for costs incurred in bringing this action;

E.    An order awarding reasonable attorney's fees under 42 U.S.C. § 1988(b); and

F.    Such other and further relief as the Court deems proper.


Dated: October 8, 2021.    Respectfully Submitted,

RANDAZZA LEGAL GROUP, PLLC
P.O. Box 5516
Gloucester, MA 01930
Tel: 702-420-2001
ecf@randazza.com

By:   /s/ Marc J. Randazza
Marc J. Randazza
Florida Bar No. 625566


GINGRAS LAW OFFICE, PLLC

David S. Gingras (*pro hac vice* forthcoming)
4802 E. Ray Road, #23-271
Phoenix, AZ 85044
Tel.: (480) 264-1400
Fax: (480) 248-3196
David@GingrasLaw.com

Attorneys for Plaintiff
Travis Grant